UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BRIDGEPORT MUSIC, INC., et al., )
                                 )
    Plaintiffs,                  )
                                 )
      v.                         )    NO. 3:05-0155
                                 )
ESTATE OF CHRISTOPHER WALLACE,   )    Judge Campbell/Brown
a/k/a NOTORIOUS B.I.G., on       )    **Jury Demand**
behalf of BIG POPPA MUSIC, et al)
                                 )
    Defendants.                  )


BAD BOY ENTERTAINMENT, INC.,     )
d/b/a BAD BOY RECORDS,           )
                                 )
    Third-party plaintiff,       )
                                 )
      v.                         )
                                 )
OSTEN S. HARVEY, JR.,            )
                                 )
    Third-party defendant.       )

**TO: The Honorable Todd J. Campbell**

<u>**REPORT AND RECOMMENDATION**</u>

**I.  INTRODUCTION**

        Presently pending before the Magistrate Judge are two
motions.   The first is for partial summary judgment by all
defendants (Docket Entry No. 50).   The second is for summary
judgment by the Universal defendants (UMG) (Docket Entry No. 106).
These motions have been referred to the undersigned for a Report
and Recommendation (Docket Entry Nos. 81 and 115).

        For the reasons stated below, the Magistrate Judge
**recommends** that the defendants' motion for partial summary judgment
(Docket Entry No. 50) be **GRANTED** in part and **DENIED** in part.
Specifically, the Magistrate Judge **recommends** that summary judgment

be **granted** as to Counts One, Four, Seven, and Eight, and **denied** as to Counts Three, Five, Six, and Nine. The Magistrate Judge further **recommends** that UMG's second motion for summary judgment (Docket Entry No. 106) be **denied**.

## II. BACKGROUND

This is another of the myriad of cases growing out of the original massive filing by Bridgeport against a large number of defendants involved in one way or the other in the music industry, in the original case of 3:01-0412. That case was subsequently severed into a number of smaller cases and litigation in those cases has proceeded unabated to date.

This particular case had its beginnings in <u>Bridgeport v. EMI April Music</u>, No. 3:01-1058. The plaintiffs attempted to amend that complaint to add new claims, however, that attempt was denied (3:01-1058, Docket Entry No. 73). Subsequently, the plaintiff Bridgeport filed the present case, and the parties agreed to dismiss the original case, No. 3:01-1058, and continue the litigation with a fresh start in this case (Docket Entry No. 40).

Accordingly, we are dealing with the third amended complaint (Docket Entry No. 30) in this matter. That complaint named as defendants, among others, the Estate of Christopher Wallace and Bad Boy Entertainment, Inc. The complaint alleged that Bridgeport had interests in the musical composition and sound recording known as "Singing In The Morning," and that rap artist Christopher Wallace had improperly sampled portions of this work in a new musical composition and sound recording "Ready to Die." They allege in their complaint that among the defendants, the Bad Boy

entities manufactured, distributed, marketed, and sold various renditions of "Ready to Die" containing samples of their work "Singing In The Morning." The plaintiffs did not sue Osten S. Harvey, Jr., professionally known as Bee Mo Easy.

The defendant Bad Boy[1] subsequently filed a third-party complaint against Osten S. Harvey, Jr. (Docket Entry No. 36). This third-party complaint alleges that Bad Boy is a corporation organized under the laws of the state of New York with its principal place of business in New York, and that the defendant Harvey is a citizen and resident of New York. They allege that in 1994, Harvey, a record producer, and Christopher Wallace, a recording artist, executed a production agreement, and pursuant to this production agreement, Harvey agreed to produce master recordings for Wallace and they produced a sound recording including the musical composition "Ready to Die."

These third-party claims were subsequently dismissed without prejudice for lack of personal jurisdiction over Mr. Harvey (Docket Entry No. 104).

The first round in this present summary motion battle was filed on September 19, 2005, when the defendants collectively moved for summary judgment on the following counts of the third amended complaint (Docket Entry No. 30):

```
Count One        - Federal Copyright Infringement;
Count Three      - Accounting Irregularities;
Count Four       - Violation of the Record Piracy Laws of
                   Tennessee;
```

---

[1]There are several variations of Bad Boy. For simplicity, all of the various Bad Boy entities will simply be referred to as "Bad Boy."

```
Count Five      - Unfair Competition;
Count Six       - Misappropriation;
Count Seven     - Conversion;
Count Eight     - Action for Declaratory Judgment of
                  Ownership; and
Count Nine      - An Action for Permanent Injunction.
```

In the event the Court does not dismiss plaintiffs' federal copyright infringement claims, the defendants requested the Court at least rule that plaintiffs are precluded from recovering statutory damages or attorneys' fees for those claims.

This motion was supported by memorandum (Docket Entry No. 51) and various other documents (See Docket Entry Nos. 53 through 59). Plaintiffs' response was filed under seal (Docket Entry No. 87).[2]

Filings in support of their response include Docket Entry Nos. 88, 89, 91, 92, 93, 94, 95, and 96. The plaintiffs' response to the statement of undisputed material facts (Docket Entry No. 58) was filed as Docket Entry No. 90.[3] The defendants' reply was filed as Docket Entry No. 119, along with a number of supporting

---

[2]The Magistrate Judge has recently unsealed a number of the pleadings in this case to simplify case management and the preparation of this Report and Recommendation. In making the Report and Recommendation, the Magistrate Judge is not sealing any portion of it, inasmuch as he does not believe he will be disclosing any matters that need to remain sealed.

[3]The Magistrate Judge, at oral argument, pointed out to both sides that they were listing as a response an objection to a statement. The term "objection" is not included in the Local Rules as an authorized response. The Magistrate Judge would note that both sides, in their statements of uncontested facts, are attempting to put in conclusions of law and other matters, which are not truly statements of undisputed facts. It would be more helpful to the Court if both sides were more circumspect and ensured that their purported statements of uncontested facts were just that - facts - rather than attempting to disguise legal conclusions as statements of fact.

4

documents, including a response to the statement of uncontested facts (Docket Entry No. 123). The gist of this rather massive amount of pleadings comes down to the defendants' contention that the plaintiffs' sound recording, "Singing In The Morning," was fixed in a tangible medium prior to February 15, 1972, and is therefore not protected by the Federal Copyright Act. They contend that if the federal copyright claims fail many of the other common law claims of the plaintiffs must also fail, particularly inasmuch as New York law must be applied rather than the law of either Tennessee or Michigan (Docket Entry No. 51).

The second motion for summary judgment (Docket Entry No. 106) is a motion by UMG alone. In its memorandum in support thereof (Docket Entry Nos. 125 and 107), UMG claims that it is a sublicensee of EMI and that EMI and its sublicensees, with certain exceptions, were released as part of a global settlement with EMI. The plaintiffs contend that UMG derives its authority from the Bad Boy defendants rather than from EMI and that the settlement agreements specifically excluded the Bad Boy defendants and anyone who purport to obtain their authority from Bad Boy (Docket Entry No. 135). The parties have again briefed this matter thoroughly and both motions were argued extensively on December 22, 2005.

III. **LEGAL DISCUSSION**

A. **Standard of Review**

The Magistrate Judge has applied the well established

5

standard for determining summary judgment motions. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails "to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. The Higbee Company, 256 F.3d 416, 419 (6th Cir. 2001).

In this connection, it must be noted that the non-movant must present sufficient admissible evidence on a material issue to qualify his case to go to the trier of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Thus, while the non-moving party may produce some evidence, the production will not be sufficient to defeat summary judgment so long as no reasonable jury could reach a finding on that issue in favor of the non-moving party.

6

**B. <u>Motion for Partial Summary Judgment By All Defendants</u>**

<u>Count One</u>

In this lawsuit, the plaintiffs contend that the defendants' musical composition entitled "Ready to Die" and the sound recording embodying it contains a sample of the musical composition and sound recording "Singing In The Morning," which plaintiffs purport to own. Both sides agree that to have a valid federal copyright the sound recording must have first been fixed on or after February 15, 1972. 17 U.S.C. § 301c. The sound recording "Singing In The Morning" was embodied on an album entitled "Pain", produced by a group of recording artists known as The Ohio Players. The defendants contend that the evidence in this case conclusively shows that this sound recording was first tangibly fixed prior to February 15, 1972.

Because of the passage of time since 1971 and 1972, both parties have produced a number of documents, album covers, memories and opinions concerning when this song was first fixed. However, it appears to the Magistrate Judge that the conclusive item of evidence in this matter is contained in an article in <u>The Billboard</u> magazine showing the rhythm and blues record sales chart for the week **<u>ending</u>** February 19, 1972. (<u>See</u> Docket Entry No. 55-1, Exhibit A). This publication shows that the album "Pain" was number 23 on the chart in its first week of release.

7

The defendants' memorandum of law (Docket Entry No. 51) is particularly clear on this issue.

The plaintiffs' response (Docket Entry No. 87) recites some of the history of their relationship with The Ohio Players and the production of a single release entitled "Pain," as well as an album release entitled "Pain." The album release did contain the song "Singing In The Rain," which is the basis for their infringement suit. The plaintiffs admit that the exact date "Singing In The Rain" was fixed in tangible medium and released on the album "Pain" is unclear, but they contend it **probably** occurred on or after February 15, 1972 (Docket Entry No. 87, p. 4). They cite various forms and other documents filed after February 1972 as supporting at least the probability that the song was not fixed until after February 15, 1972. Their Form U filed with the Copyright Office bears a notation that the song was copyrighted in 1972 and this form was received in the Copyright Office on May 22, 1972 (Docket Entry No. 87, p. 6). The plaintiffs also contend that the Billboard chart is inadmissible hearsay and not properly authenticated.

The defendants, in their reply (Docket Entry No. 119), include an additional article from Billboard Magazine dated February 12, 1972 (Docket Entry No. 121, Exhibit A), which shows a review of the album "Pain" in that edition.

8

The plaintiffs objection to the lack of authenticity and hearsay nature of these exhibits is not well taken. Federal Rule of Evidence 902 provides that extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to newspapers and periodicals. Rule 803 provides that statements in a document in existence 20 years or more, the authenticity of which is established, is not excluded as hearsay, even though the declarant is available as a witness.

The plaintiffs did not dispute at oral argument that Billboard Magazine is a reputable magazine well known in the recording industry. Accordingly, the Magistrate Judge finds that the articles referred to in Billboard Magazine are admissible.

In their response (Docket Entry No. 87, p. 8), plaintiffs made the suggestion that the possibility existed that, since the chart covered the week ending February 19, 1972, and that it was the album's first week on the chart, it could have been released on February 15, 16, 17, or 18.

However, at oral argument, the plaintiffs, while not fully conceding the issue, did concede that without some further explanation of the Billboard evidence, they would be hard pressed to establish that the song was not fixed prior to February 15, 1972.

With all due respect to this argument, the possibility that the record could have been recorded, reproduced, distributed,

and elevated to number 28 on the charts in less than a week simply is not tenable.[4]  No reasonable jury could disregard this evidence and find for the plaintiffs on this issue.  The other evidence concerning conflicting dates printed on record labels, and belated filings showing dates after February 15, 1972, is simply not credible.  Ms. Peterer and Mr. Boladian, Bridgeport's primary witnesses, simply have been unable to produce any credible evidence to discredit this fact.  These affidavits and depositions of these witnesses are more speculation than fact, and they admit some of the dates are estimates (see, for example, Docket Entry No. 56, pp. 48-51; Docket Entry No. 57, pp. 47-50, 53-61).

Thus, the Magistrate Judge believes that the defendants are entitled to summary judgment on the issue that the song is not subject to copyright protection.  Accordingly, Count One of the third amended complaint should be **dismissed**.

### Diversity Jurisdiction

This conclusion then requires the Magistrate Judge to turn to the common law and other statutory issues raised in the complaint (Docket Entry No. 30).

The defendants, in their memorandum of law (Docket Entry No. 51) urge that a majority of the state law claims should be

---

[4]To quote loosely from a song by Kenny Rogers, "You gotta know when to hold them and know when to fold them."  This is a time to fold a busted flush.

10

dismissed as a matter of law.[5]  The defendants point out that, after they first raised in correspondence with the plaintiffs the possibility of a problem with their copyright, the plaintiffs added a number of state law claims in their third amended complaint (Docket Entry No. 30).

The defendants point out that without the federal copyright claims, only state law claims remain and that the plaintiffs have failed to adequately allege diversity jurisdiction. The plaintiffs have responded in their brief (Docket Entry No. 87, pp. 11-12), that the documents in this case do establish diversity between the plaintiffs and the defendants, and that a court should not dismiss a case where diversity jurisdiction is not alleged, so long as it appears that the court would have diversity of citizenship jurisdiction. Citing Stafford, Miller, C.W. v. Davis, 507 F.2d 308, 310 (6th Cir. 1974).  Given the extensive litigation involved in this case, as well as related cases, the Magistrate Judge is satisfied that diversity exists and that it would not be an efficient use of judicial resources to dismiss this case simply to require the plaintiffs to refile by alleging jurisdiction.  To the extent that diversity jurisdiction has not been sufficiently alleged, the plaintiffs should be permitted to amend their

---

[5]Count 2 is not challenged in this motion.

11

complaint to the limited extent of specifically alleging diversity jurisdiction.[6]

### **Choice of Law**

The first issue the Court must deal with is that of choice of law. A federal court sitting in diversity must apply the conflict of laws rules of the state in which it sits. <u>Klaxton Co. v. Stentor Electric Mfg. Co.</u>, 313 U.S. 487 (1941). Tennessee has adopted the principals set forth in <u>Restatement Second of the Conflicts of Law</u>, § 145. <u>Hathaway v. McKinley</u>, 830 S.W.2d 53, 59 (Tenn. 1992). Under this approach, the rights and liabilities of the parties to an action in tort are determined by the local law of the state that has the most significant relationship to the incident and to the parties involved. Some of the factors to be considered are (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residency, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship of the parties is centered. The plaintiffs insist that the law of Michigan is most applicable while the defendants insist that the law of New York is most applicable.

---

[6]This is but another example of over-litigation by the parties and attorneys in this case. They prefer protracted litigation to agreement to amend. This is a case where defendants should have folded their pair of deuces on this issue.

Case 3:05-cv-00155   Document 169   Filed 01/24/06   Page 12 of 29 PageID #: 2213

Applying these four factors to the case at hand, the Magistrate Judge believes that with the exception of the claims under Count Four for violation of the record piracy laws of Tennessee under T.C.A. § 39-14-139, and Count Five alleging unfair competition under T.C.A. § 47-25-104, the law of New York should apply. Both sides have briefed this issue. (<u>See</u> Docket Entry Nos. 51, 87, and 119).

The first factor to be considered is the place where the injury occurred. Westbound is headquartered in Michigan and makes the argument that the alleged infringement caused them injury there. On the other hand, the actual infringement occurred in New York, where the alleged infringing recording was created, manufactured, and initially distributed. In addition, the defendants are headquartered in New York.

The Magistrate Judge believes that under the particular facts of this case, New York is the state having the most connection with the injury.

The second factor is the place where the conduct causing the injury occurred. The plaintiffs stringently argue that they are located in Michigan and that is where they suffered injury. They point out that distribution was made throughout the United States. Therefore, despite the fact that the infringement might have initially been produced in New York, New York has no unique claim to the matter.

13

The Magistrate Judge respectfully disagrees and believes that New York, in fact, has the most connections with the conduct causing the injury.

The third factor is the domicile, residence, or place of business of the parties. In this case, the plaintiffs are located in Michigan, while the defendants are primarily located in New York. Normally, when a plaintiff sues in the plaintiff's home state, this factor should be given additional weight. In this case, the plaintiffs have chosen not to litigate in their home state or the state in which they maintain their principal place of business, but to litigate in Tennessee. While jurisdiction and venue is proper in Tennessee, the fact that the plaintiffs have strayed from their home state undercuts their claim that their home state's law should apply. The defendants are, of course, stuck with whatever state the plaintiffs can properly sue them in. Nevertheless, their domicile, residence and place of business must be considered and they are all located in New York. Accordingly, the Magistrate Judge believes that this factor tips slightly toward New York.

The final factor is the place where the relationship between the parties is centered. This factor seems to be neutral.

Looking at the unique factual situation of this case, the Magistrate Judge believes that the only factor favoring the choice of Michigan law is the fact that the plaintiffs reside in Michigan.

14

However, as pointed out above, the plaintiffs have not chosen to litigate in their home state but have selected Tennessee.

It appears to the Magistrate Judge that the most significant factors are that the alleged infringing acts took place in New York, the center of complained of conduct was New York, and the defendants are either residents, domiciliaries, or are otherwise strongly connected to New York.

Accordingly, New York law should apply, except as otherwise stated.

## Count Three

Turning to Count Three, the Magistrate Judge believes that summary judgment as to this count should be **denied**. The plaintiffs have alleged common law infringement in Count Two, and the defendants have not sought to obtain summary judgment on that count. If the plaintiffs can prevail on Count Two, they are entitled to an accounting in this matter.

## Count Four

The defendants moved for summary judgment on the plaintiffs' claim for violation of the record piracy laws of Tennessee, T.C.A. § 39-14-139 <u>et</u> <u>seq.</u>, on the grounds that this statute only applies to unauthorized copies of live performances. They point out that this statute provides in pertinent part as follows:

15

(c)(1) It is unlawful for any person to knowingly manufacture, transfer, record or store on any recorded device, with the intent to sell for commercial advantage or financial gain, a live performance knowing the live performance was recorded or stored without the consent of the owner of the live performance.

(2) It is unlawful for any person to knowingly advertise, sell, rent, transport or possess with the intent to sell, rent or transport, for commercial advantage or private financial gain, a recorded device containing a live performance knowing that the live performance has been recorded or stored without the consent of the owner of the live performance.

(3) As used in this section, "live performance" means the recitation, rendering or playing of a series of images and/or musical, spoken or other sounds, in any audible sequence.

The defendants quote from the legislative history to show that the statute was intended to prohibit bootleg copies made by a member of an audience at a live performance. (<u>See</u> defendants' brief, Docket Entry No. 51, pp. 17-19).

The plaintiffs have attempted to argue that the term "live performance" includes the sampling complained of herein.

With all due respect to this argument, the statute refers to live performances, and regardless of how it is characterized, the product in question here is not a recording from a live performance. Accordingly, the Magistrate Judge believes that the defendants are entitled to summary judgment on Count Four, and it should be **dismissed**.

16

## Count Five

Count Five is a complaint for unfair competition under Tennessee and Michigan law. The plaintiffs contend that the defendants' conduct in copying portions of their recording of "Singing In The Morning" constitutes unfair competition under Tennessee statutory and common law and Michigan common law. The plaintiffs did not, in this count, make any reference to New York law. The Court should look to New York law to determine whether the plaintiffs have been able to state an unfair competition complaint in paragraphs 51-54. The defendants argue that under New York law, an unfair competition claim must establish some element of bad faith. <u>Citing</u> <u>Wilson v. Electro Marine Systems, Inc.</u>, 915 F.2d 1110, 1118 (7th Cir. 1990).

The plaintiffs' respond that even using New York law they have a valid claim for unfair competition. They point out that one element of unfair competition is when a defendant removes the plaintiff's name from the product and substitutes its own name thereon, a "palming off." They point out that they believe the evidence would show that Bad Boy authorized the release of the album, even though the samples had not been cleared, and that they decided to use "Singing In The Morning" without permission deliberately, rather than through any inadvertence or mistake. They cite, for example, the case of <u>Noble v. Great Brands of Europe</u>, 949 F.Supp. 183 (S.D. N.Y. 1996) for that proposition. In

17

the Noble case, the Court held that a complaint was sufficient to allege unfair competition under New York common law, where the defendant placed its own copyright notice on the plaintiff's photographic image without paying the plaintiff an appropriate fee.

The New York Court of Appeals has had an extensive discussion of infringement and unfair competition in the recent case of Capitol Records, Inc. v. Naxos of America, Inc., 4 N.Y.3d 540 (2005). That Court, at pages 562-63, held that a cause of action for common law copyright infringement is not the same as unfair competition under New York law. Fraud or bad faith is not an element of an infringement action under modern New York law. It appears, however, that under New York law, in accordance with the Capitol Records case, unfair competition requires -- in addition to unauthorized copying and distribution -- competition in the marketplace or similar actions designed for commercial benefit.

It appears that the complaint is sufficient to allege, in addition to unauthorized copying and distribution, actual competition in the marketplace or similar action, and also sufficiently alleges bad faith. While bad faith was not explicitly plead in Count Five, nevertheless, it appears that there is an element of bad faith inherent in the act of copying and selling a work without permission from a competitor, because, if true, this would deprive the owner of the work's value.

18

The Magistrate Judge, therefore, believes that there are sufficient factual disputes concerning the circumstances of the alleged sampling and its subsequent distribution that summary judgment is not appropriate for this count.

## Count Six

Count Six is an allegation of misappropriation. The defendants argue in their reply brief (Docket Entry No. 119) that the plaintiffs failed to plead a single act of bad faith or deception, and thus are precluded from prevailing on their misappropriation claims because they have failed to allege acts of bad faith.

The plaintiffs have argued in their brief (Docket Entry No. 87) that "an unfair competition claim may be grounded in the appropriation of the exclusive property of the plaintiff by the defendant." Arista Records, Inc. v. MP3 Board, Inc., U.S. Dist Lexis 16165 (S.D. N.Y. 2002). The Magistrate Judge believes that much of the discussion under Count Five is applicable here. To the extent the plaintiffs are able to establish unfair competition, they will have laid the groundwork for a misappropriation claim. Capitol Records, Inc. v. Naxos of America, Inc., 4 N.Y.3d 540 (2005). The Capitol Records court held that actions for common law copyright infringement and unfair competition are not synonymous under New York law. The court specifically stated fraud or bad faith is not an element of an infringement action in modern New

19

York law.  Id. at 563.  This decision allows the plaintiffs' common law infringement claims.  It does not, however, preclude the plaintiffs' unfair competition claim.  It appears to the Magistrate Judge that the plaintiffs have at least minimally alleged bad faith, which does seem to be required to differentiate unfair competition from common law copyright infringement under New York law.  Taking the plaintiffs' allegations in their most favorable light, the complaint alleges the act of sampling was deliberately done, after permission for use of another song could not be secured.

While not plead with the clarity one might have desired, nevertheless, it appears to the Magistrate Judge that there are sufficient elements alleged in the complaint, which, if true, could state a claim under the misappropriation branch of unfair competition in New York.  Noble v. Great Brands, 949 F.Supp. 183, 186-7 (S.D.N.Y. 1996).  Therefore, summary judgment is not appropriate.

### Count Seven

Count Seven is an allegation of conversion under Michigan law.  For the reasons stated above, the Magistrate Judge believes that Michigan law does not apply to this case, and accordingly, the defendants are entitled to summary judgment on this count.  To the extent there is any claim for conversion under the laws of New York or Tennessee, the defendants have pointed out that in all three

20

states, conversion actions involving intangible copyright property have not been upheld (Docket Entry No. 51, pp. 19-20). The plaintiffs, in their response, stress the fact that Michigan law should apply and that Michigan has not foreclosed the possibility of conversion of intangible property involving copyrights. They do not cite any law that such claims would be allowed under Tennessee or New York law. Inasmuch as the Magistrate Judge has concluded that New York law should apply, summary judgment should be granted to the defendants and Count Seven should be **dismissed**.

### Count Eight

Although the defendants moved for summary judgment on Counts Eight and Nine in their brief, they did not separate this argument. It would have been extremely helpful if the defendants had addressed their argument to dismiss various counts to the counts individually.

Count Eight seeks declaratory judgment of the plaintiffs' ownership of the claimed copyright, a percentage ownership in the alleged infringing composition and sound recording, and a declaration that any assignments concerning the alleged infringing copyrighted material are null and void.

It appears that this claim for relief is based on the validity of the copyright. In view of the Magistrate Judge's recommendation that there is no statutory copyright in this matter,

21

the Magistrate Judge believes that summary judgment should be **granted** to the defendants as to Count Eight.

<u>**Count Nine**</u>

Count Nine is a request for permanent injunction. It appears that, to the extent the plaintiffs can establish a violation of their common law copyright under Count Two, they may be entitled to some type of injunctive relief. Accordingly, the Magistrate Judge believes that the motion for summary judgment as to Count Nine should be **denied.**

C. <u>**Motion for Summary Judgment by UMG Based on Release**</u>

The Magistrate Judge will now turn to UMG's second motion for summary judgment (Docket Entry No. 106).

<u>**Background**</u>

This second motion involves only UMG and its divisions. The plaintiffs allege that the "Ready to Die" album contains the plaintiffs' song, "Singing In The Morning." The producer of this album, Osten Harvey, Jr., professionally known as Easy Mo Bee (Harvey"), and Bad Boy's President, Sean "P Diddy" Combs (Combs) chose to use "Singing In The Morning" after they were unable to secure permission to use "Power of Love" by Jimmy Hendrix. They allege that Harvey and Combs did not secure approval for this alleged copying. The song "Ready to Die" was subsequently released on several albums, some of which were then distributed by UMG,

22

pursuant to a 2003 distribution deal between Bad Boy Records and UMG.

In February 2003, a settlement conference was held concerning the various Bridgeport cases.  During this conference, plaintiffs settled their claim against EMI and certain of its related entities.  This settlement was memorialized in a written agreement in April 2003 (Docket Entry No. 129, Exhibit A).  The parties agree that at the time of the settlement agreement with EMI, the parties did not know of a Bad Boy distribution deal with UMG or that UMG intended to release any of Bad Boy's product (Docket Entry No. 164, paras. 8-9, 11-12).  They agree that there was no discussion of UMG being released in connection with the Bad Boy songs.

UMG alleges that EMI was a co-publisher and co-owner of the musical composition "Ready to Die" and administered the compositions on behalf of publisher Justin Combs Publishing, Bee Mo Easy Music, and Big Poppa Music, and that EMI licensed the musical composition "Ready to Die" for use in the sound recording of the same name performed by artist Christopher Wallace, professionally known as Notorious B.I.G.  The sound recording was licensed for use on the album "Ready to Die", released and distributed by Arista Records Inc., Bad Boy Entertainment, Inc., and Bad Boy Records (Bad Boy).  They further state that the album "Ready to Die," including the sound recording and musical composition "Ready to Die" was

23

later re-released in various formats by Bad Boy Records and distributed by a division of UMG. They contend that EMI consented to UMG's distribution of the musical composition "Ready to Die" provided Bad Boy Records accounted for and paid EMI all mechanical royalties otherwise due EMI in respect of such distribution by Universal. (Declaration of Michael Borja, Docket Entry No. 163).

## Release Agreement

The legal issue in this case is relatively straightforward. Did the release agreement between Bridgeport and EMI effect a release of UMG? The agreement itself, which is Exhibit A to Docket Entry No. 129, in pertinent part reads as follows:

4. **Release by Bridgeport.**

A. Bridgeport, on behalf of itself and its successors and assigns, hereby assigns, hereby releases and forever discharges EMI, its songwriters, recording artists, producers, affiliated co-publishers, administered publishers, subpublishers, <u>distributors, subdistributors</u>, licensees or <u>sublicensees</u> (emphasis added) of EMI, and their officers, directors, shareholders, partners, agents, contractors, attorneys, predecessors in interest, affiliates, subsidiaries, parent and sister companies, successors and assigns (the "Released Parties") from any and all claims, lawsuits, counterclaims, demands, changes, obligations, debts, losses, costs, liabilities, expenses, actions, and causes of actions past, present or future, known or unknown, of whatsoever nature, which Bridgeport may have, including but not limited to all claims arising out of the EMI Works, the Bridgeport Compositions and Sound Recordings, the Alleged Infringements, the Additional Claims, and the Lawsuits. All of the claims released by Bridgeport shall be hereinafter referred to as the "Released Claims." For purposes of clarification, it is the intention of

24

Bridgeport to release any and all parties that derive their rights from EMI ("Licensees") to the same extent as EMI is released herein. Licensees are being released only with respect to Released Claims where they are a licensee of EMI and not for claims where Licensees do not derive their rights from EMI.

* * * *

D. The foregoing release, and the other provisions contained herein, specifically does not apply to Justin Combs Publishing, Bad Boy Records, or Bad Boy Entertainment. Bridgeport recognizes and agrees that any settlement of claims asserted by Bridgeport against Justin Combs Publishing is subject to the EMI's approval which shall not be unreasonably withheld. Bridgeport will look solely to Justin Combs Publishing, Bad Boy Records, or Bad Boy Entertainment for any payment required by such settlement. Bridgeport may settle with Bad Boy Records or Bad Boy Entertainment without the approval or consent of EMI.

E. Furthermore, notwithstanding the release above, to the extent that any songwriter, administered publisher, or affiliated co-publisher, is required, by contract, to approve of the transfer of any share of any composition that EMI has agreed to transfer to Bridgeport, such songwriter, administered publisher, or affiliated co-publisher is not released herewith if that party refuses to give EMI its consent. In the event such party refuses to give consent to EMI, EMI shall promptly provide Bridgeport with the address and telephone number of any party.

UMG claims that it is a sublicensee of EMI, and as such, under the clear language of ¶ 4A, they are released. They cite the declaration of Michael Borja (Docket Entry No. 163) for this proposition. The plaintiffs, on the other hand, point to the ending language of ¶ 4A, which states that licensees are being released only with respect to released claims, where they are a licensee of EMI and not for claims where licensees do not derive

25

their rights from EMI; and ¶ 4D, which provides specifically that Justin Combs Publishing, Bad Boy Records or Bad Boy Entertainment are not released.  They dismiss the use of the word "sublicensees" as mere boilerplate.

The statements of material facts not in dispute, filed by both parties (Docket Entry Nos. 136 and 164) are not particularly helpful.  As pointed out earlier, both sides rather than responding to various statements, list objections.  Both sides, in their statements, have also attempted to state legal conclusions rather than factual statements.  However, in Docket Entry No. 164, ¶ 8, the defendants do not dispute, for the purpose of this summary judgment motion, that had plaintiffs known  about the 2003 distribution deal between Bad Boy and UMG, or UMG's plan to re-release "Ready to Die," and to release both "Ready to Die-The Remaster" and "Ready to Die-The Remaster (Clean)" in 2004, plaintiffs would have excluded UMG as a released party, along with the listed Bad Boy entities.

They also agree, for the purpose of this motion, in ¶ 9, that plaintiffs did not intend to release UMG for the Bad Boy Claims.

In ¶ 12, they agree that plaintiffs had no knowledge of the 2003 Bad Boy and UMG distribution deal.

26

The Bridgeport representatives, as well as their counsel, all reiterate that they had no intention whatever to release anyone who derived their rights through the various Bad Boy entities.

Counsel for EMI, Mr. Sullivan, in his declaration (Docket Entry No. 129), verifies the settlement agreement but makes no statement whatever as to whether there was any intention to release UMG.

Both parties cite the case of <u>Evans v. Tillett Brothers Construction, Inc.</u>, 545 S.W.2d 8 (Tenn. Ct. App. 1976). The parties also agree that Tennessee law applies to the settlement agreement. After a review of the pleadings and argument of counsel, the Magistrate Judge is satisfied that there are sufficient factual disputes that preclude summary judgment on this issue.

It is true that plaintiffs may not escape the use of the word "sublicensee" by claiming it to be mere boilerplate. This is not a fill-in-the-blank release such as was used in the <u>Evans</u> case. This is a document drawn up between attorneys who are paid big bucks for documents that are not simply boilerplate.

The defendants are correct that parties are bound by the clear language they use in a document and that the best evidence of the meaning of the parties is the document itself. <u>Associated Press v. WGNS, Inc</u>., 348 S.W.2d 507 (1961).

27

It is particularly significant to the Magistrate Judge that EMI's attorney, Mr. Sullivan, makes no claim that there was an intent to release UMG. It is clear from the document that there was absolutely no release of Bad Boy Records, Justin Combs Publishing, and Bad Boy Entertainment.

It makes no sense for the parties to the settlement agreement to not release these three entities and then release other entities deriving their rights directly through these three. While UMG makes an argument that it is a sublicensee of EMI, the fact remains that it does not appear that they ever directly negotiated with EMI. Their negotiations were with the Bad Boy entities. While Mr. Michael Borja, the manager, legal and business, for EMI Music does state that EMI consented to Universal's distributing the musical composition "Ready to Die," provided Bad Boy Records accounted for and paid EMI all mechanical royalties otherwise due EMI in respect of such distribution by Universal (Docket Entry No. 163), he provides no documentation for this statement and gives no indication as to the date of this "consent," nor does he indicate that the consent was conveyed to UMG rather than to Bad Boy Records.

It appears to the Magistrate Judge that a reasonable jury could easily find that there was no intent by the parties to the settlement agreement to release those entities deriving their rights directly from the Bad Boy entities.

28

Accordingly, the Magistrate Judge must **recommend** that this motion be **denied.**

**IV. RECOMMENDATION**

For the reasons stated above, the Magistrate Judge **recommends** that the defendants' motion for partial summary judgment (Docket Entry No. 50) be **GRANTED** in part and **DENIED** in part. Specifically, the Magistrate Judge **recommends** that summary judgment be **granted** as to Counts One, Four, Seven, and Eight, and **denied** as to Counts Three, Five, Six, and Nine. The defendants' second motion for summary judgment (Docket Entry No. 106) should be **DENIED.**

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in this Report in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111 (1986).

**ENTERED** this 24th day of January 2006.

/s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge